## Case No. 354.

ANDERSON v. BANK.

[Chase, 535.][2]

Circuit Court, D. North Carolina. June Term, 1869.

PRINCIPAL AND AGENT — RELATION — EFFECT OF CIVIL WAR—LIABILITY OF AGENT—TAKING CONFEDERATE CURRENCY—PLEADING.

1. The late civil war did not revoke an agency in the southern states, established before the war, by a citizen of one of the northern states, but such an agent was bound to act with due care and diligence.

[See Botts & Darnall v. Crenshaw, Case No. 1,690.]

[See note at end of case.]

2. The receipt of Confederate treasury notes in payment of a debt due to a citizen adhering to the national government was not the exercise of such diligence.

[See Fretz v. Stover, 22 Wall. (89 U. S.) 198; Taylor v. Thomas, Id. 479.]

3. Such receipt did not discharge the debtor from his debt, though paid in form, and the notes delivered to him as paid by the agent, were not paid in fact.

[See Fretz v. Stover, 22 Wall. (89 U. S.) 198; Taylor v. Thomas, Id. 479.]

[See note at end of case.]

4. Nothing could discharge him except ratification of the acts of the agent or voluntary release by the creditor, or actual payment in lawful money.

[See Fretz v. Stover, 22 Wall. (89 U. S.) 198; Taylor v. Thomas, Id. 479.]

5. The agent can not be sued along with the debtor for the amount of the debt, without an averment of the insolvency of the debtor.

6. But this having been done, the plaintiff may either amend his bill and charge the insolvency of the principal, or he may, under the circumstances, take a decree against the agent for the value of the Confederate currency paid

[1][Reported by Hon. William Cranch, Chief Judge.]

[2][Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

by the debtor, and a further decree against the debtor for what would then remain due after crediting this on the debt.

7. If the plaintiff is not content with such a decree, he may amend his bill by alleging the insolvency of Harris and loss of his debt through the unauthorized action of the bank.

In equity. Anderson lived in Kentucky and employed Young, also a citizen of that state, to sell mules for him in North Carolina. In August, 1860, Young as his agent sold mules to Harris in North Carolina, and took the notes of Harris for the purchase-money, payable to Anderson in January, 1861. Immediately after receiving the notes, Young deposited them in the Bank of Cape Fear at Raleigh, North Carolina, for collection, having first endorsed them for Anderson, as his agent, to Jones, cashier of the bank.

Harris did not pay the notes when they became due, but on January 22, 1861, paid part of one of them, which amount the bank remitted to Anderson by mail, less commissions and exchange. On February 22, 1861, Harris made another payment on account, which amount the bank likewise remitted by mail to Anderson, less commissions and exchange. In November, 1862, Harris paid to the bank the balance due on the notes, with interest to the date of payment in Confederate treasury notes, and received from the bank his two notes to Anderson.

The currency so received was placed by the bank to the credit of Anderson on special deposit, and subsequently invested by it in Confederate seven per cent. bonds, which bonds were placed in a package, among the special deposits of the bank marked, "Jno. Jay Anderson, Side View, Montgomery County, Kentucky." During the fall of 1862 Young was in Raleigh, and went with Harris to the Bank of Cape Fear, where Harris paid the notes in Confederate currency to Jones in the presence of Young. Whereupon Young demanded the amount so paid of Jones, who declined to deliver it to him on the ground that he had no authority from Anderson to collect it. Young claimed to have authority from the fact that Harris had given him the notes as agent for Anderson, and that he as such agent had endorsed and delivered them to Jones for collection.

As soon as the war terminated, and communication between Kentucky and North Carolina was restored, Anderson repudiated the action of the bank in securing Confederate currency for his notes, and filed his bill in equity against Harris and the bank, charging that the notes never had been paid; that they had been delivered to Harris without authority by collusion between the bank and Harris to defraud him.

The respondents put in separate answers. The bank admitted the reception of the notes for collection. Stated that it had remitted to Anderson all collections as long as it

was possible to do so, and that in receiving payment of the notes in Confederate currency, it had acted with due care and diligence in protecting Anderson's interest, exercising the same discretion as was used by the best business men in the community in the transaction of their own business, and just as much as had been at that time exercised by prudent executors, guardians, and other fiduciaries, and denied the charge of collusion. Harris, in his answer, admitted the main facts as charged, denied collusion, and claimed that Young as agent of Anderson had ratified his payment to the bank.

Young testified that on his visit to Raleigh in 1862, he was no longer agent of Anderson, that relation having terminated the year before.

Phillips & Buttle, for complainant.
Rogers & Bachelor, for the bank.
E. G. Haywood, for Harris.

CHASE, Circuit Justice. This is a suit in equity by the plaintiff, a citizen of Kentucky, against the defendants, who are citizens of North Carolina. The substance of the case is that Anderson having sold some mules to Harris, received his bonds for the price, and deposited them in the Bank of Cape Fear for collection, late in 1860, or early in 1861. Subsequently, the bank received partial payments, which were remitted to Anderson. The civil war broke out soon afterward, and there were no further payments until November, 1862, when the balance on the first bond was paid. The second bond of $450, and interest, were paid in full early in 1863. These payments were made in Confederate notes, and the bonds were surrendered to Harris.

The bill charges that there was collusion between the bank and Harris in this attempt to satisfy the bonds by payment in Confederate currency, and prays that the defendant may be compelled to satisfy the debt due from Harris. The bill does not allege that Harris is insolvent, and the charge of collusion is denied by the answer, and not supported by proof.

There is no doubt that the bank was constituted his agent for collection by the plaintiff, and it is not denied that its duties as such were faithfully fulfilled until after the commencement of the civil war. The agency of the bank was not terminated by the breaking out of hostilities. The bank might, indeed, have declined to act further under its agency, and might have retained the bonds for delivery to the plaintiff, but if it acted at all, it was bound to act with care and diligence. In our opinion, the receipt of Confederate notes, in payment of a debt due to a citizen of a state adhering to the national government, was not the exercise of such diligence. Such receipt, however, did not discharge the debtor from his debt. The

bonds, though paid in form and delivered to him as paid by the agent, were not paid in fact. He still remained liable for the full amount of the debt. Nothing could discharge him except ratification of the acts of the agent, or voluntary release by the creditor, or actual payment in lawful money. No discharge, such as is here described, is alleged. The evidence is that the creditor disavowed the unauthorized acts of the agent and insisted on payment in full. But he can not recover damages for consequential loss without proof of such loss. If the debtor is not discharged, and is able to pay the debt, and no loss has arisen to the creditor from the acts of the bank, it is difficult to see how the creditor can establish any right as against that corporation. Rights and remedies as between the bank and the debtor are matters between them, and not between the bank and the creditor, unless loss has arisen to the creditor. But the bill contains no allegation of the insolvency of the debtor or of other loss. In the present state of the pleadings, therefore, the particular relief prayed for in the bill can not be granted.

But since the bank is undoubtedly liable to the debtor for the value of the Confederate notes received from him, and the debtor remains liable to the creditor for the full amount of the bonds, we think that, to avoid multiplicity and circuity of action, under the general prayer for relief, and upon the whole case, a decree may be made for the payment by the bank to the plaintiff of the amount due to Harris, and against Harris for the balance remaining due after crediting that amount upon the bonds. If the plaintiff is not content with such a decree, his bill, in its present form, must be dismissed; but if he chooses, he may amend by alleging the insolvency of Harris, and loss of his debt through the unauthorized action of the bank. Emerson v. Mallett, Phil. Eq. 236; State v. Mebane, 63 N. C. 315; "Liability of Guardian," see Confederate Notes.

[NOTE. The one exception to the rule that war suspends all commercial intercourse between the citizens of two belligerent states is that of allowing the payment of debts to an agent of an alien enemy, where such agent resides in the same state with the debtor. But, said Mr. Justice Bradley, in Insurance Co. v. Davis, 95 U. S. 425, "this indulgence is subject to restrictions. In the first place, it must not be done with the view of transmitting the funds to the principal during the continuance of the war, though, if so transmitted without the debtor's connivance, he will not be responsible for it. * * * In the next place, in order to the subsistence of the agency during the war, it must have the assent of the parties thereto. * * * It is not enough that there was an agency prior to the war. It would be contrary to reason that a man without his consent should continue to be bound by the acts of one whose relations to him have undergone such a fundamental alteration as that produced by a war between the two countries, to which they respectively belong."]